Mark Andrew KOHLER, Appellant,

v.

STATE of Texas, Appellee.

Deanna Elaine KOHLER, Appellant,

v.

STATE of Texas, Appellee.

Nos. 13–85–281–CR, 13–85–282–CR.

Court of Appeals of Texas,
Corpus Christi.

May 29, 1986.

Rehearing Denied June 26, 1986.

Roy C. Turcotte, W.R. Hitchens, Kingsville, for appellant.

Grant Jones, Dist. Atty., Corpus Christi, for appellee.

## OPINION

SEERDEN, Justice.

A jury convicted appellants of murdering their infant son and set punishment at ten years' confinement probated for ten years. We affirm the judgments of the trial court.

By their first two grounds of error, appellants challenge the sufficiency of the evidence to prove the necessary intent and that lack of food and medical care caused baby Luke's death.

We must view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *McGoldrick v. State*, 682 S.W.2d 573, 577–78 (Tex.Crim.App.1985); *Garrett v. State*, 682 S.W.2d 301, 304–5 (Tex.Crim.App.1984); *Jackson v. State*, 672 S.W.2d 801, 803 (Tex. Crim.App.1984); *Carlsen v. State*, 654 S.W.2d 444, 447 (Tex.Crim.App.1983).

The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given their testimony. A jury may accept or reject any testimony.

*Penagraph v. State,* 623 S.W.2d 341, 343 (Tex.Crim.App.1981); *Barros v. State,* 661 S.W.2d 337, 340 (Tex.App.—Corpus Christi 1983, no pet.)

■ Under TEX.PENAL CODE ANN. § 19.02(a)(1) (Vernon 1974), a person commits murder if he (1) intentionally or knowingly (2) causes the death of an individual. The State charged that appellants caused the death by not providing food and medical care, which they had a duty to provide. The evidence indicates that baby Luke's medical care consisted of a checkup one day after birth, the removal of the cap from his circumcision when he was about a week old, and the monitoring of his heartbeat at an appointment for his brother. Luke was three months old at death. Appellants never took Luke for checkups as recommended, even though medical care was free and readily available. Although appellants attempted to adduce evidence that the child died of Sudden Infant Death Syndrome, medical experts disagreed with appellants. Several doctors who saw the baby at his death testified that the child was emaciated or malnourished and opined that starvation or malnourishment was the cause of death. We hold there was sufficient evidence for the jury to find that appellants failed to provide food and medical care for the child. Acts of omission have been found intentional by circumstantial evidence in similar cases. *See Righi v. State,* 689 S.W.2d 908, 910 (Tex.App.—Beaumont 1984, pet. ref'd); *De Leon v. State,* 684 S.W.2d 778, 782 (Tex.App.—Corpus Christi 1984, no pet.); *Battle v. State,* 681 S.W.2d 104, 107 (Tex.App.—Houston [14th Dist.] 1984, pet. ref'd). Grounds one and two are overruled.

By their third ground of error, appellants assert that the trial court erred in admitting "evidence of a search and fruits thereof without a warrant" when there was no evidence that appellants' consent was voluntary. Appellants objects to the testimony of Yanira Rosales, a Department of Human Resources caseworker, Police Investigator Cavazos, and Police Sergeant Arnold Acuna, who inspected appellants' house trailer on November 17, 1984.

Acuna testified that JoAnn Kohler, the victim's paternal grandmother, contacted him and communicated that she feared for the life and safety of the child Mark, Jr. ("Andy"). He instructed her to get permission from her son so they could inspect. His primary concern was to see that the child was in good health. About an hour and a half after the first contact, JoAnn contacted him again and asked him to come to the trailer. When he arrived, JoAnn invited him in. He introduced himself to Mark, and JoAnn led him on a tour of the trailer.

Cavazos testified that he arrived after Acuna had seen the trailer, and that he met Acuna outside. They knocked, and Mark opened the door. They asked if they could come in, and Mark said yes. Cavazos testified that he asked Mark if he could look before Acuna gave him a tour of the trailer, and Mark said yes.

■ Police officers who are invited in are not trespassers. If an officer is lawfully where he is, he may seize what is in open view. In this case, appellant seeks to suppress testimony of the view itself. The officers did not gain access to the trailer by fraud or deceit. Acuna was invited into and escorted through the trailer by appellant Mark's mother. He had a right to go where he was invited, to make observations, and to recount his observations to the jury. *Swink v. State,* 617 S.W.2d 203, 210 (Tex.Crim.App.1981) *cert. denied,* 454 U.S. 1087, 102 S.Ct. 648, 70 L.Ed.2d 624 (1981); *Alberti v. State,* 495 S.W.2d 236, 237 (Tex.Crim.App.1973); *Bell v. State,* 676 S.W.2d 219, 220 (Tex.App.—Corpus Christi 1984, pet. ref'd). When Officer Cavazos asked, Mark specifically allowed him to look around.

■ Fourth Amendment protections against searches only apply to searches conducted by law enforcement personnel. Rosales and appellant Mark's mother were not law enforcement personnel, and they testified in detail about the conditions in

the trailer. The testimony to which appellants object is merely cumulative of that given by appellant Mark's mother without objection. Thus, its admission is not reversible error. *Brasfield v. State,* 600 S.W.2d 288, 296 (Tex.Crim.App.1980); *Lichtenwalter v. State,* 554 S.W.2d 693, 694 (Tex.Crim.App.1977). We overrule appellants' third ground.

■ Appellants' fourth ground alleges that the trial court erred in failing to quash the indictment because it did not negate the existence of exceptions to appellants' parental duties set out at TEX.FAM.CODE ANN. § 12.04 (Vernon Supp.1986).

TEX.FAM.CODE ANN. § 12.04 begins, "Except as otherwise provided by judicial order or by an affidavit of relinquishment of parental rights ... the parent of a child has the following rights, privileges, duties, and powers." Section 12.04(3) lists the parental duties to provide a child with food and medical care.

This question was discussed in *Priego v. State,* 658 S.W.2d 655 (Tex.App.—El Paso 1983, no pet.). We agree with the analysis in that case that under TEX.FAM.CODE ANN. § 11.01 (Vernon 1975), one is not a parent if voluntary relinquishment or judicial termination of the parental relationship has taken place. We hold the indictment sufficient. Ground of error number four is overruled.

In their fifth and final ground of error, appellants claim that the evidence was insufficient to negate the exceptions discussed in ground of error number four. We disagree. The testimony is replete with references to the status of appellants as parents of the deceased. They each testified and freely admitted he was their son. Their defense to the charge was that they had provided adequate food and medical care for their child, that any failure to do so was because of their pre-occupation with the serious heart condition of an older child, and that the deceased died from a condition known as Sudden Infant Death Syndrome. We hold the evidence was sufficient for the jury to find appellants the parents of the deceased within the meaning of TEX.FAM.CODE ANN. § 12.04 (Vernon Supp.1986). The fifth ground of error is overruled.

The judgments of the trial court are AFFIRMED.

Before SEERDEN, UTTER and BENAVIDES, JJ.

## OPINION ON MOTION FOR REHEARING

SEERDEN, Justice.

Appellants have requested rehearing, asserting that "the court erred in holding that the evidence was sufficient to support the jury's verdict as the State failed to prove the necessary intent to cause death and that death was caused by lack of food and medical care as alleged in the indictment." Under their ground of error, they argue that the evidence on intent will not support a finding of guilt beyond a reasonable doubt.

■ Circumstantial evidence is generally relied on and is sufficient to prove a required culpable mental state. *Thompson v. State,* 676 S.W.2d 173, 175 (Tex.App.—Houston [14th Dist.] 1984, no pet.). If the evidence supports an inference other than the guilt of an accused, a finding of guilt beyond a reasonable doubt is not a rational finding. *Chambers v. State,* (Tex.Crim. App.1986) 711 S.W.2d 240 (on State's motion for rehearing); *McGoldrick v. State,* 682 S.W.2d 573, 577–78 (Tex.Crim.App. 1985); *Freeman v. State,* 654 S.W.2d 450, 456 (Tex.Crim.App.1983). The necessary intent or *mens rea* for murder is intentionally or knowingly. TEX.PENAL CODE ANN. § 19.02(1)(a) (Vernon 1974). The charge, to which no objections were made, states:

A person acts intentionally, or with intent, with respect to the nature of his/her conduct or to a result of his/her conduct when it is their conscious objective or desire to engage in the conduct or cause the result.

A person acts knowingly, or with knowledge, with respect to the nature of

his/her conduct or the circumstances surrounding his/her conduct when he/she is aware of the nature of his/her conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his/her conduct when he/she is aware that his/her conduct is reasonably certain to cause the result.

The definitions in the charge come from TEX.PENAL CODE ANN. § 6.03(a) and (b) (Vernon 1974). The jury was also given the opportunity to find appellants not guilty, or guilty of criminally negligent homicide.

■ We need not speculate on appellants' conscious objective or desire. It is sufficient that evidence shows that appellants were aware that the circumstances existed, and that their conduct would be reasonably certain to cause death.

Luke was 3 months old at death. At birth, he weighed 6½ pounds, and the doctor who delivered him testified that he was normal. During the first half of Luke's life, his maternal grandmother cared for him while his mother worked. Dr. Simpson, the older son's doctor, testified that he saw Luke at an appointment for his brother when Luke was about a month old. He listened to Luke's heart, and noticed no signs of malnutrition.

At death, Luke weighed only 4 to 6 ounces more than his birth weight. Both the pathologist who conducted the autopsy and the doctor who signed the death certificate testified that on a standard growth chart, Luke was below the fifth percentile in weight for an infant of three months. This was characterized as "way abnormal." His head circumference was also "way below normal." Dr. O'Ryan, a pediatrician who saw the infant shortly after birth and after it was dead, testified to three stages of malnutrition in infants. He said that in the first stage, the baby will use its fat and lose weight, in the second stage, there is a growth arrest, and "in the more severe form of starvation when the baby hasn't had anything, hardly anything at all, ...

the head circumference is below normal because the brain itself stops growing."

All of the doctors and medical personnel who participated in the attempts to revive Luke testified that he was emaciated. Kevin Oliver, a general duty hospital corpsman who assisted giving CPR, said the child's facial bones were prominent, he could count the ribs, and "skin and bones" would be a good description. He also said that its skin was not elastic. Dr. Chilton said the baby looked like "one of the Ethiopian children you see on a commercial" and said it had sunken cheeks and "hardly any meat." Dr. Siegel said the child was "skin and bones" with "sunken cheeks." Flight surgeon Lillian Wilson said she first thought because of its size that the child was four weeks old or younger, and that the skin was like dehydrated skin, that the child had no muscle tone, "no muscle, no fat." Dr. Restrepo, who had treated starving children in Colombia, opined that the child starved. He mentioned "an angulated-type of face," "prominent ribs," and lack of fat. He also said the baby had "atropic skin" indicative of lack of food or vitamins.

Given the evidence of the child's weight and extreme appearance, the jury could infer that its condition was noticeable to appellants prior to the child's death.

There was also direct evidence of appellants' awareness of the child's condition. The maternal grandfather testified that three days before Luke died, he and his wife had advised appellants to take Luke to a doctor because of his failure to gain weight. The maternal grandmother acknowledged that she had given such advice. Appellants testified that they were going to take Luke on the day he died, although they had no appointment.

Appellants mention that the death certificate lists "Sudden Infant Death" (SIDS) among causes. The doctor who wrote the certificate testified that he listed several possible causes, including "failure to thrive," and that starvation was a type of "failure to thrive." He explained in detail how he came to reject the SIDS theory and

form the idea that the child starved. The other doctors who were asked about SIDS explained their reasons for rejecting that explanation.

We find the evidence, and particularly that on intent, sufficient to support the jury's verdict. We OVERRULE appellants' motion for rehearing.