

# NUMBER 13-13-00172-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

| | |
|---|---|
| **ABRAHAM JACOB PROENZA,** | **Appellant,** |
| **v.** | |
| **THE STATE OF TEXAS,** | **Appellee.** |

## On appeal from the 404th District Court
## of Cameron County, Texas.

# OPINION

## Before Chief Justice Valdez and Justices Rodriguez and Garza
## Opinion by Justice Rodriguez

Appellant Abraham Jacob Proenza challenges his conviction for injury to a child,

four-month-old A.J.V.,[1] by omission, a first-degree felony. *See* TEX. PENAL CODE ANN.

---

[1] We use initials to identify the minors in this case.

§ 22.04(a)(1), (b)(2), (e) (West, Westlaw through Ch. 49, 2015 R.S.) (providing that "[a] person [who has assumed care, custody, or control of a child] commits [a first-degree felony] if he . . . intentionally [or] knowingly . . . by omission, causes to a child . . . serious bodily injury"). The jury returned a guilty verdict and assessed punishment at forty years in the Texas Department of Criminal Justice—Institutional Division. By four issues, Proenza contends: (1) the evidence is insufficient to show he committed the offense of injury to a child resulting in serious bodily injury; (2) the trial court improperly commented on the weight of the evidence; (3) the trial court erred when it denied his motion to recuse; and (4) the trial court abused its discretion when it admitted certain autopsy photographs into evidence. We reverse and remand.

## I. BACKGROUND

### A. Abraham and Sandra Proenza

Proenza and his wife Sandra testified that they have two daughters, who were three and one when A.J.V. was born in Minnesota to Sandra's sister on April 2, 2008. Hoping to adopt the baby, Proenza and Sandra drove from Texas to take him home with them. Proenza testified that he had always wanted a little boy, and he and Sandra named him. A.J.V.'s birth mother came to Texas when A.J.V. was approximately three or four weeks old and accompanied Sandra when they took A.J.V. to Su Clinica. It is undisputed that A.J.V.'s birth mother did not sign papers authorizing anyone else, including Proenza or Sandra, to take A.J.V. for medical care. According to Proenza, she would not respond to phone calls and had changed her phone numbers. Proenza

2

believed that, without her permission, he would not be able to take A.J.V. to his scheduled appointment at Su Clinica in early August.[2]

Proenza and Sandra testified that they raised A.J.V. together until approximately July 20, 2008, when Proenza's mother's daycare closed—Proenza worked there as the director and Sandra as a teacher and driver. Sandra went to Minnesota to work shortly thereafter. Sandra testified that she left A.J.V. and their three-year-old daughter in Proenza's care, while her mother cared for their one-year-old daughter. They enrolled their daughters in another daycare, but according to both Sandra and Proenza, they could not enroll A.J.V. there because they could not show legal guardianship or adoption and, according to Sandra, they did not have A.J.V.'s birth mother's signature on the daycare forms.

Around this same time, J.S.M., Proenza and Sandra's fifteen-year-old nephew and the baby's half-brother, began staying with Proenza because he had nowhere else to live. Proenza testified that J.S.M. agreed to help with A.J.V. Proenza showed J.S.M. how to care for A.J.V.—how to change the baby's diaper and how to feed him; J.S.M. acknowledged that he understood. According to Proenza, J.S.M. cared for the baby when Proenza was not at home and when Proenza was there but "separate with [his] girls." Proenza also testified that on the Wednesday before A.J.V. passed away, he

---

[2] According to his medical records, A.J.V. was seen at the clinic on April 17, April 27, and June 10, 2008. In addition, Investigator and Lead Agent Daniel Valerio of the Cameron County Sheriff's Office testified that a Su Clinica appointment card for A.J.V.'s follow-up visit on August 4, 2008, had been attached to Proenza's refrigerator door. A.J.V.'s medical records from the clinic show that he missed an August 8, 2008 appointment.

enrolled in a business school and asked J.S.M. to care for A.J.V. while he was attending classes.

Proenza testified that on August 11, 2008, he went to school and when he returned he checked with J.S.M. to make sure A.J.V. had been fed and bathed. J.S.M. replied that he had. Later that evening, Proenza put A.J.V. to bed while he cooked dinner for his daughters. According to Proenza, A.J.V. was a normal color when he put him to bed. When he checked on A.J.V. fifteen minutes later, A.J.V. was blue and purple in color and his mouth was open. Proenza immediately began CPR and told J.S.M. to call 911. A sheriff's deputy arrived within twenty minutes and told Proenza to keep doing CPR until EMS arrived. EMS arrived fifteen minutes later, took over CPR, and then transported A.J.V. to the hospital. Proenza testified that when the sheriff let him leave, he went to the hospital and learned from his mother that A.J.V. had passed away. Officers took Proenza to the sheriff's department, where he gave a statement.

Proenza explained to the jury that he never knew that J.S.M. had mishandled A.J.V. Proenza related that on August 11, 2008, A.J.V. did not look like he was dying "at all." He had been throwing up, but not a whole bottle. Proenza did not take A.J.V. to the hospital or Su Clinica because he thought if he took A.J.V. for medical care they would not see him because he did not have proper documentation from A.J.V.'s mother.

## B.    Pediatrician Carol Grannum, M.D.

Carol Grannum, M.D., a pediatrician employed at Su Clinica, testified that medical records from Su Clinica show that A.J.V. was seen on April 17, 2008, when he was fifteen days old. The results of his newborn screening blood tests were normal, and he weighed

4

approximately seven pounds.   An April 29, 2008 entry reported that on that date A.J.V. weighed eight pounds.   According to the medical records, A.J.V. was seen at Su Clinica again on June 3, 2008.   He weighed ten pounds, eleven ounces and was taking Similac Advance, six ounces every three hours.   At a June 10, 2008 follow-up visit, A.J.V. weighed eleven pounds, was coughing less, and eating well.   According to Dr. Grannum, the medical records showed that A.J.V. was current on his immunizations and was progressing as he should according to growth charts.

Dr. Grannum agreed that if someone, other than a parent, tried to take a child to the clinic, he could not be seen, even for a follow-up appointment.   Dr. Grannum also testified, however, that she would not deny treatment to a child who was in acute distress: he would be told to go to the hospital's emergency room, or he would be stabilized at the clinic and the clinic personnel would call an ambulance to transfer him to the hospital.

The trial court questioned Dr. Grannum concerning the documentation required for a follow-up visit once a child is a registered patient of the clinic.   Later, during re-cross examination, Dr. Grannum clarified that "the [minor] patient has to be with a legal guardian or with the mom or dad."   And, in response to inquiries by the trial court, Dr. Grannum repeated "it's routine that if it's not mom and dad and if that person who is bringing the child in, if that name is not on the form, that person cannot bring the child in."

## C.    Peace Officer Jose Barreda

Jose Barreda, a patrol officer with the Cameron County Sheriff's Office, responded to the 911 call from the Proenza home.   When Barreda arrived, he found Proenza performing CPR on A.J.V.   Barreda described Proenza as "excited nervous" but agreed

5

that Proenza's demeanor gave him no indication that something wrong had happened. Barreda testified that "the baby was not moving, was not breathing, his eyes were open[,] and his mouth was also open." In his opinion, A.J.V. "had expired."

## D.    Paramedic Marciano Montanez Jr.

Marciano Montanez Jr., a paramedic with South Texas Emergency Care EMS, arrived at Proenza's home twenty minutes after he received a call. He began performing CPR on A.J.V. In his opinion, Proenza was helping the child by providing CPR. After securing the child's airway and starting an IV, EMS transported A.J.V. to the hospital.

## E.    Investigator and Lead Agent Daniel Valerio

Investigator and Lead Agent Daniel Valerio of the Cameron County Sheriff's Office testified that he arrived at Proenza's home after EMS had taken A.J.V. to the hospital. He collected information from the scene and spoke briefly with Proenza, who told him that he placed A.J.V. on a bed in a room by himself because he was crying and when "he was not crying any more, they went back and checked on him. That's when they found—they found him not breathing." Valerio went to the hospital where Dr. Hayden informed him that A.J.V. had died and that he was badly malnourished.

In the early morning hours of August 12, 2008, Valerio interviewed Proenza at the Cameron County Sheriff's Office.[3] According to Valerio, Proenza's demeanor during his interview was that he had not done anything wrong, that he was "much more concerned with what was going to happen to him." On cross-examination, Valerio explained that he

---

[3] After the jury viewed the entire interview, the trial court admitted the DVD as State's Exhibit 33, without objection.

6

reached this conclusion because Proenza "never gave us a right explanation of why he didn't take [A.J.V.] to the doctor."

Valerio testified that, after obtaining a search warrant, he "went back and photographed" the home to document the living conditions. He explained that he "didn't find any milk there, as best as I can recall, or bottles. At that point in time, the first night we were there, we didn't see any—any used bottles that he was being fed with."

Finally, Valerio agreed that he arrested J.S.M., who was fifteen at the time, for injury to A.J.V. Valerio also agreed that he had no information that Proenza was feeding A.J.V. anything other than baby formula.

## F.  Captain Javier Reyna

Captain Javier Reyna, an investigator at the Cameron County Sheriff's Office, testified that he conducted a second recorded interview with Proenza on the afternoon of August 12, 2014. The trial court admitted the DVDs of that interview as State's Exhibits 36 and 37, and they were played for the jury. During cross-examination, Captain Reyna agreed that Proenza mentioned that he had taken A.J.V. to the grocery store a day or two earlier and had bought a four-pack of Stage 1 baby food. But Captain Reyna did not remember seeing baby formula at the house, and even had he seen formula, it would not prove A.J.V. was eating it because there was a one-year-old child there also. Captain Reyna testified that Proenza told him he had never been arrested. Proenza also told him A.J.V. had been throwing up on August 11, 2008 and that he did not have documentation to seek medical treatment for A.J.V. According to Captain Reyna,

7

Proenza told him during the interview that he called his wife in Minnesota because he was concerned about how much A.J.V. was throwing up.

**G.    Forensic Pathologist Norma Jean Farley, M.D.**

Norma Jean Farley, M.D., a forensic pathologist for Hidalgo County, testified for the State. According to Dr. Farley, she conducted an autopsy on A.J.V. on August 12, 2008. She determined that his cause of death was dehydration and malnutrition. The State offered and the trial court admitted autopsy photographs of A.J.V. taken by Dr. Farley. She agreed that malnutrition could not happen overnight and that there would be other physical things occurring in the child's body that would be apparent from the outside, including "the way the physique of how the child looked when he changed the diaper [or bathed the child]. You would notice, you know, the folds on the buttocks, the fact that the ribs are very prominent." According to Dr. Farley, when she examined the intestine, she could see no sign of recent food consumption, except for a piece of green pepper inside the small bowel. Dr. Farley testified that there were no signs that the child had vomited and no signs that he had been fed formula because she found no curdled, milky substance in the stomach or the small bowel. When asked to give an approximate time since the child had eaten, Dr. Farley responded,

> He had a green pepper sometime probably in the last 24 hours. Other than that, I didn't see anything else. The bowel, of course, can clear itself out in about 24, 48, some people say 72 hours, of all of its contents, but I didn't see anything else to show me that the child was being fed.

Regarding dehydration, Dr. Farley testified that A.J.V. exhibited the following signs: a depressed soft spot; sunken eyes; dry mucus membrane on the inside of the eyes and lips; and poor skin turgor. She testified dehydration occurs faster in infants, especially if

8

the infant has diarrhea, "if the family waits and doesn't take it to the doctor, it could be dehydrated the next morning and really need water quickly." Dr. Farley agreed that dehydration and malnutrition were the cause of death and that A.J.V. "may have survived, especially with just fluids." She also agreed that, in her opinion, the conditions of malnutrition and dehydration were "very obvious."

**H.      Friends Mandy Cantu and Her Husband Armando Vela Jr.**

Mandy Cantu and her husband Armando Vela Jr., who were long-time friends of the Proenzas, testified for the defense. Cantu and Vela testified that they had seen A.J.V. on three different occasions. According to Cantu, Proenza properly cared for and handled A.J.V. because the baby did not look malnourished or sick in any way. He was always clean and always dressed. On each occasion, however, they observed that J.S.M. handled A.J.V., as Cantu testified, "not very gentle" and "kind of rough."

Approximately two weeks after A.J.V. died, Cantu met with Investigator Valerio and when asked if she thought that A.J.V. was in need or sick or malnourished, Cantu answered, "No." Cantu told Valerio that Proenza, his daughters, J.S.M., and A.J.V. had come to a cookout at her house the weekend before A.J.V. died. She had taken the younger children inside to watch television and play. She changed A.J.V.'s diaper and noticed that he had some diarrhea—"just regular diarrhea"—a medium amount. Cantu explained that it did not alarm her or cause her to worry about his welfare—"other than that, to [her], he looked okay, . . . he looked fine." After she changed A.J.V.'s diaper, Cantu fed him a bottle that Proenza had brought and that she made up for the baby. And

9

when shown a picture of A.J.V. after he died, although Cantu described A.J.V. as thin, she related that he did not look like that days before his death.

## I.     Parents Ramon and Rosalinda Proenza

Ramon and Rosalinda Proenza, Proenza's father and mother, also testified for the defense.   Ramon stated that he saw Proenza, A.J.V., J.S.M., and Proenza's daughters when he returned from vacation on August 3 or 4, 2008.   Ramon observed that on this occasion A.J.V. seemed "okay" to him—that he did not see anything wrong with the baby. According to Ramon, Proenza had everything he needed for his children including formula for A.J.V. and food for the others.

Rosalinda testified that she saw A.J.V. for the first time when he was just days old, and Proenza brought him to work at her church daycare.   According to Proenza's mother, before the daycare closed and before Sandra went to Minnesota to work, A.J.V.'s mother had come to Texas to take A.J.V. to the doctor because—as Proenza's mother understood—he was "throwing up a lot."   She also testified that on July 25, 2008, Proenza brought his daughters and A.J.V. to her house to wait for Hurricane Dolly to pass. Proenza brought formula for A.J.V.   During that time, Rosalinda fed him several times, but he continued to throw up.   She did not, however, notice if he was dehydrated at that time.   Rosalinda indicated that she was not concerned about Proenza's ability to take care of the baby.   She described Proenza as an "over-caring dad" who took many photographs of his children and was "all happy" about having a boy in the family. According to Rosalinda, on one occasion, she saw J.S.M. hitting A.J.V. in the chest and

10

shaking him. And like Cantu, Rosalinda testified that she saw A.J.V. a few days to a week before he died and that he did not look like the child in the photographs.

## J.    Friend Aaron Villarreal

Aaron Villarreal, who had known Proenza for at least twenty years, testified that he saw Proenza with A.J.V. in July when the baby was "real small." Villarreal agreed that he saw nothing wrong with the baby at that time. About a month later, after Hurricane Dolly, Proenza, his two daughters, A.J.V., and J.S.M. stayed with him during the day for about four days and one night because Proenza's home air conditioner was out and "[t]hey were extremely exhausted." Villarreal explained that he noticed at that time that A.J.V. "looked a little bit skinnier." He was also "tired" and "cranky" like all the other kids who had to wait in line with Proenza for meals at a makeshift shelter because of the hurricane. Villarreal testified that he went home for lunch one day and found the children there but not Proenza. When Villarreal asked J.S.M. where A.J.V. was because he could not see him, J.S.M. responded, "I put him in the closet because he wouldn't shut the f*** up, he kept crying." Villarreal told J.S.M. to leave, took A.J.V. from the closet, made him a bottle with powdered formula Proenza had left for him, and fed him. He saw J.S.M., who he described as "mad at the world" and always giving everyone a "bad attitude," mishandle A.J.V. on another occasion when the child was crying. Villarreal described A.J.V. as "really frail," "maybe four months at the time," and "a baby, who hadn't developed. You know, it didn't have enough strength to sit himself up or anything like that." He also testified that Proenza held A.J.V. "properly" and that he "never saw [Proenza] like grab him forcefully or anything like that."

11

**K.    Pastor Helen Rodriguez**

Helen Rodriguez, pastor of the church where Proenza was a member, testified that she saw Proenza at church with his daughters and A.J.V. on three occasions.   According to Rodriguez, Proenza cared for the baby at the church.   When Rodriguez saw A.J.V., she thought he "looked perfectly."   She had no concerns about A.J.V.'s health or welfare.

**L.    Child Protective Services Special Investigator Jesse Munoz Jr.**

Jesse Munoz Jr., a special investigator at Child Protective Services, testified that he had conversations with Proenza and J.S.M. at the jail the night A.J.V. died and a second time to discuss the circumstances surrounding the child's death as well as to check on the welfare of the other children in the home.   According to Munoz, he reported that Proenza was not happy with their decision to bring A.J.V. home with him and that A.J.V. was "kind of causing a little financial burden with him and him going to school." Proenza told him "that the only thing that was peculiar, that was not normal, was that the baby was vomiting everything the baby would eat."   According to Munoz, Proenza told him that the baby drank six ounces of Enfamil formula and 3 ounces of water a day and that J.S.M. was the last one to feed the baby on August 11 around 2:30 p.m.

## I.    SUFFICIENCY OF THE EVIDENCE

By his first issue, Proenza challenges the sufficiency of the evidence to support his conviction for injury to a child.   He argues that "[t]he record is simply devoid of any evidence that [he] intentionally or knowingly caused serious bodily injury to [A.J.V.] [A.J.V.] appeared to be a happy, young child who tragically became sick during a tumultuous period after a hurricane."

12

**A.    Standard of Review**

In reviewing the legal sufficiency of the evidence, this Court examines all the evidence in the light most favorable to the verdict to determine whether the jury could rationally find the essential elements of injury to a child, by omission, beyond a reasonable doubt.   *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 896 (Tex. Crim. App. 2010) (plurality op.).   This Court gives deference to the judgment of the jury regarding the weight and credibility of the evidence and only asks whether the inferences supporting its verdict are reasonable based on the combined or cumulative force of all the evidence.   *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *Mayberry v. State*, 351 S.W.3d 507, 511 (Tex. App.—San Antonio 2011, pet. ref'd) (citing *Jackson*, 443 U.S. at 319).   In a sufficiency review, circumstantial evidence is just as probative as direct evidence, and circumstantial evidence, standing alone, can be sufficient to establish guilt.   *Clayton*, 235 S.W.3d at 778.

**B.    Applicable Law**

Legal sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge.   *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried."   *Villarreal*, 286 S.W.3d at 327.

13

Section 22.04(a) of the penal code provides, in relevant part, that a person commits an offense if he intentionally or knowingly, by act or omission, causes bodily injury to a child. TEX. PENAL CODE ANN. § 22.04(a). As authorized by the indictment, Proenza committed injury to A.J.V., a child, if he assumed care, custody, or control of A.J.V. and intentionally or knowingly, by failing to feed him or failing to seek medical care for him, caused A.J.V. serious bodily injury. *See id.* § 22.04(a)(1), (b)(2), & (d). A person acts intentionally when "it is his conscious desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West, Westlaw through Ch. 49, 2015 R.S.). A person acts knowingly with respect to a result of his conduct when "he is aware that his conduct is reasonably certain to cause a result." *Id.* § 6.03(b). Section 22.04 defines "child" as "a person 14 years of age or younger." *Id.* § 22.04(c)(1). "Serious bodily injury" means "bodily injury that . . . causes[, among other things,] death . . . ." *Id.* § 1.07(a)(46) (West, Westlaw through Ch. 49, 2015 R.S.). "For purposes of an omission . . . the actor has assumed care, custody, or control if he has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted responsibility for protection, food, shelter, and medical care for a child . . . ." *Id.* § 22.04(d).

## C. Discussion

Proenza does not dispute that he had assumed care, custody, or control of A.J.V. at the time of his death. *See id.* § 22.04(b)(2), (d). Instead, Proenza generally claims that the evidence is insufficient to show that he intentionally or knowingly caused serious bodily injury to A.J.V. by failing to feed him or by failing to seek medical care for him. *See id.* § 22.04(a)(1).

14

Proenza summarizes the evidence, which he claims supports his argument, as follows:

> In this case, Deputy Barreda testified that when he arrived at [Proenza's] home on the night of August 11, 2008, [Proenza] was performing CPR and he did not think that foul play was involved in [A.J.V.]'s death. In fact, he took no steps to secure the scene, remove [Proenza's] other children, or keep [Proenza] from continuing to perform CPR. When Valerio interviewed [Proenza], [he] was forthcoming and told Valerio that [A.J.V.] had been crying and when he went to check on him, [A.J.V.] was not breathing. Valerio admitted that [J.S.M.] was arrested for injuring [A.J.V.] Cantu, Vela, Ramon Proenza, Rosalinda Proenza, Villarreal, and Pastor Rodriguez all saw [A.J.V.] days before he died and all testified that [he] looked fine. Specifically, when Cantu saw [A.J.V.], he did not look malnourished. In addition, she saw [J.S.M.] handling [A.J.V.] roughly and feeding him solid food. When Ramon saw [A.J.V.], he had no concerns about [A.J.V.]'s welfare and [Proenza] had all the supplies necessary to take care of his children including formula and food. Likewise, when [Proenza] and his children stayed with Villarreal [following Hurricane Dolly], [Proenza] had formula and supplies. While [A.J.V.] was at Villarreal's home, [J.S.M.] put [A.J.V.] in a closet because he would not stop crying. Pastor Rodriguez saw [Proenza] with [A.J.V.] and his daughters at church on several occasions and thought [A.J.V.] "looked perfectly." Munoz told the jury that when he interviewed [J.S.M.], [J.S.M.] pulled out scissors and started attacking a nearby wall[,] which caused Munoz to fear for his life.
>
> [Proenza] explained that [A.J.V.] had been throwing up just before he passed away, but had been receiving the food and care he needed. When [Proenza] discovered [A.J.V.] was not breathing, he immediately started CPR and continued for over forty-five minutes until EMS arrived. Again, the first officer on [the] scene testified that he did not think foul play was involved and took no steps to separate [Proenza] from [A.J.V.] or his other children.
>
> . . . . The medical examiner even testified that dehydration can set in in a mere twenty-four to forty-eight hours, which is a common length of time for an infant to have an illness.

Proenza concludes by asserting that "[t]he evidence is simply insufficient to show [he] committed the offense of injury to a child resulting in serious bodily injury." *See id.*; *Brooks*, 323 S.W.3d at 896. We disagree.

15

While it is arguable that the evidence referenced by Proenza shows that he did not intentionally or knowingly cause A.J.V. serious bodily injury by his *affirmative acts,* it is not Proenza's affirmative actions but his omissions in failing to feed A.J.V. and in failing to seek medical care for the child that are relevant in this case, in short, whether Proenza intentionally or knowingly *by omission* caused A.J.V.'s death. And evidence, other than that Proenza sets out above, established the essential elements of injury to a child, by omission, beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319 (1979); *Brooks*, 323 S.W.3d at 896.

The evidence shows that A.J.V. was born on April 2, 2008, and died on August 11, 2008, when he was four months old. A.J.V.'s pediatrician, Dr. Grannum, testified that at fifteen days of age A.J.V. weighed almost seven pounds when he presented to Su Clinica as a normal newborn. A week and one-half later, A.J.V. weighed 8 pounds. At two months of age, according to the clinic's records, A.J.V. weighed 10 pounds 11 ounces and was taking Similac Advance, six ounces every three hours. On June 10, 2008, during his last follow-up visit, the clinic records show that A.J.V. weighed 11 pounds, was coughing less and eating well, was current on his immunizations, and was progressing as he should according to growth charts. Yet Dr. Farley, the forensic pathologist who conducted the autopsy on A.J.V., testified that when A.J.V. died one month after his last clinic visit he weighed eight pounds three ounces. This was almost three pounds less than he weighed a month earlier and only one pound and three ounces more than he weighed when he was born.

16

Defense witnesses—some who saw the child only days before he died—testified that A.J.V. looked fine. Yet Mark Hayden, M.D., an emergency physician who saw A.J.V. when he arrived at the hospital the night he died, testified that A.J.V. appeared malnourished. Dr. Hayden noted that the medical records revealed that "[A.J.V.] appeared small and poorly nourished for his age." And Dr. Farley testified that her determination of the cause of death was dehydration and malnutrition. She described A.J.V.'s appearance in her autopsy report as follows:

> The infant had a very sunken abdomen, meaning—you know, most infants have either not protruded or slightly protruded abdomen. This one was sunken in. And the ribs were very prominent. You could see the ribs very easily from the skin just looking at the child. And th[ose] were some of the signs of this malnutrition—malnutrition. There's also that, and we kind of call it the old person look, where the skin is all wrinkled and kind of falling, gathering together around the buttocks and upper thigh area that we see in malnourished individuals, that was also present especially along the buttocks and upper thigh region. . . .

The autopsy photographs of A.J.V. showed "[a] very malnourished child"—they show[ed] "really very, very" sunken abdomen, ribs that are "very prominent," and some wrinkled folds of skin.

> Regarding dehydration, Dr. Farley testified that

> the signs of dehydration w[ere] the soft spot at the top of [A.J.V.'s] head, the fontanel, anterior fontanel was depressed. His eyes were sunken. And the mucus membrane, really like the inside of the eyes and inside of the lips, appeared dry. And, of course, poor skin turgor just means when you pinch the skin, it usually falls back down relatively quickly. But if you're dehydrated, it will just stand in that upright position for quite some time. It won't come back down because the moisture in the skin isn't there and the subcutaneous tissue isn't there and so it just stays pinched and standing up.

17

According to Dr. Farley, when she pinched A.J.V.'s skin together, it stayed up more than a minute.

Given the evidence of A.J.V.'s weight and his extreme appearance, the jury could have inferred that his condition was noticeable to Proenza prior to the child's death. It is sufficient that the evidence, by inference, shows Proenza was aware that the circumstances existed and that his conduct—failing to feed A.J.V. and failing to seek medical care for him—would be reasonably certain to cause the child's death. *See* TEX. PENAL CODE ANN. § 6.03(b) (defining when a person acts knowingly with respect to the result of his conduct); *Kohler v. State*, 713 S.W.2d 141, 145 (Tex. App.—Corpus Christi 1986, pet. ref'd) (op. on reh'g). This inference based on circumstantial evidence is reasonable based on the combined or cumulative force of all the evidence, when reviewed in the light most favorable to the jury's verdict. *See Clayton*, 235 S.W.3d at 778; *Mayberry*, 351 S.W.3d at 511 (citing *Jackson*, 443 U.S. at 319).

There was also direct and other circumstantial evidence of Proenza's awareness of the child's condition. Proenza acknowledged that A.J.V. had refused his bottle on the evening he died; he had thrown up his formula that night. The evidence reveals that A.J.V. had been "throwing up a lot" for a long period of time, even before the day care closed. After Sandra had gone to Minnesota, Proenza called her because he was concerned about how much A.J.V. was throwing up. And there is evidence that on July 25, 2008, A.J.V. threw up his formula on several occasions while staying with Proenza and the other children at Proenza's parents' home waiting for Hurricane Dolly to pass. Yet Proenza acknowledged that he did not take A.J.V. to the clinic for a visit early in

18

August because he thought they would not see him without the necessary papers from A.J.V.'s mother, and Proenza sought no emergency medical care for the child for the same reason. Instead, Proenza relied increasingly on J.S.M. to watch A.J.V., to clean him, and to feed him.

Proenza also testified that he did not feed the baby the day he died; J.S.M. told Proenza that he had fed A.J.V. Proenza explained that on that evening, he saw J.S.M. attempt to feed A.J.V. a bottle but the baby would not take it. Proenza acknowledged that it was possible that A.J.V. had not eaten the day he died, or even the night before he died. While Proenza testified that A.J.V. was being fed, he was not aware of how often.

In sum, the State presented evidence that Proenza knew that A.J.V. was throwing up his formula and had been doing so for a period of time. He discussed A.J.V.'s condition with his wife. Proenza thought A.J.V. was being fed, but did not know how often. Proenza saw A.J.V. reject his bottle the evening he died. Yet he sought no medical care either at the clinic or at the hospital because he did not have the right documentation from the child's mother. Although this evidence leads to the conclusion that Proenza's reason for failing to provide medical care was that he believed that the clinic would not see A.J.V. without the proper documentation, the evidence shows that Proenza was aware of A.J.V.'s condition and the need to feed A.J.V. or to take him to the clinic or the hospital for medical care and Proenza did not even try to take A.J.V. to see a doctor.

**D.    Summary**

19

Examining all the evidence in the light most favorable to the verdict and giving deference to the judgment of the jury regarding the weight and credibility of the evidence, we conclude that the evidence is legally sufficient to support Proenza's conviction. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 896. The jury could have rationally found, beyond a reasonable doubt, that Proenza intentionally or knowingly caused A.J.V.'s death by failing to feed A.J.V. or by failing to seek medical care for him. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 896; *see also* TEX. PENAL CODE ANN. § 22.04(a)(1). We overrule Proenza's first issue.

## II.    JUDICIAL BIAS

By his second issue, Proenza argues that the trial court improperly commented on the weight of the evidence by, among other things, questioning Dr. Grannum about what documentation is required for a child's follow-up clinic visit. *See* TEX. CODE CRIM. PROC. ANN. art. 38.05 (West, Westlaw through Ch. 49, 2015 R.S.) (providing that, before the return of the verdict, the trial judge shall not "make any remark calculated to convey to the jury his opinion of the case"). Proenza argues that the trial court's "comments violated Texas Code of Criminal Procedure [a]rticle 38.05 by indicating a disbelief in the defense's position and by diminishing the credibility of the defense's approach to the case." *See Simon v. State*, 203 S.W.3d 581, 590 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Proenza also argues that the trial court's actions were so egregious that the trial court violated his right to a fair and impartial trial, such that fundamental error occurred and he could complain about it for the first time on appeal. He asserts that the trial court's questions and interjected facts were harmful to him and favorable to the State.

20

Proenza complains that the trial court's comments "undoubtedly influenced the jury's verdict" when it negated his defensive theory by attempting to show that he could have fraudulently obtained medical care.

In response, the State asserts that Proenza did not preserve error on this issue because he did not object to the trial court's comments at the time they were made. *See Unkart v. State*, 400 S.W.3d 94, 99 (Tex. Crim. App. 2013). The State argues that, even if Proenza preserved error, the trial court's questions to the witness were not comments on the weight of the evidence. The State asserts that, instead, the questions "were [asked] in order to clarify what [Proenza's] trial counsel had already asked [Dr. Grannum]" and "do not show a disbelief in the defense's theory nor did they diminish credibility as to the defense's approach to the case." The State offers no response to Proenza's fundamental-error argument.

## A.      The Trial Court's Comments and Questions

Proenza complains of a colloquy that occurred between the trial court and the State's witness, Dr. Carol Grannum, a pediatrician at Su Clinica. Before the trial court asked questions of Dr. Grannum, Proenza and the State elicited the following relevant testimony from Dr. Grannum during their cross-, redirect-, and recross-examinations:

[Cross-Examination by Proenza]

Q.      Well, let me ask you this, Doctor, if somebody else tries to take the child that's not the parent and has no documentation as a guardian, what occurs?

A.      Then we can't see the patient.

Q.      Even for a follow-up?

21

A.    Yeah, we can't see the patient.

Q.    What's the reason for that?

A.    Well, we have had problems before where the patient has come in without a legal guardian, and if shots are given and if the parents didn't sign for the shots, you know, they have often just become very angry with us, so we always have to have that.

Q.    Also for legality purposes, the parent is the one who authorizes?

A.    Right, someone to bring the child in.

Q.    The medication, the prescriptions and everything else. The treatment, basically?

A.    Right.

    . . . .

[Redirect-Examination by the State]

Q.    Doctor, if a patient came to your clinic who was visibly in distress, would you ever deny them care?

A.    Oh, we would see the patient and we would say, you know, this—you know, if we can't take care of a situation here, we will call the ambulance and the patient will be, you know, transferred to the hospital, to the Emergency Room if the patient were in distress.

Q.    So you wouldn't deny a patient?

A.    No.

    . . . .

[Recross-Examination by Proenza]

Q.    Well, you said you would call the ambulance, but you are not committing yourself accessible to treat the patient right on the spot.

A.    Right. We will go to the front desk, if the patient were in acute distress, and we would say, you need to go to the Emergency Room

22

right away and we will call EMS. If the patient were in acute distress, we would stabilize the patient first and still call EMS.

Q. Correct.

After counsel for Proenza and the State indicated they had no further questions and asked that the witness be excused, the trial court entered into the following complained-of colloquy with Dr. Grannum.

THE COURT: Ma'am, once the child is a registered patient of the clinic, what do you all require for documentation on follow-up visits.

THE WITNESS: Meaning if the patient needs to come back, we would give them a little note saying you [are] due back in a week or in two weeks or two months.

THE COURT: So in this case, you had given [A.J.V.] a follow-up appointment.

THE WITNESS: Yes.

THE COURT: When he—when [A.J.V.] is presented for his return visit, what do you require if anything, for the child to be seen?

WITNESS: We would see the patient unless the patient wasn't brought in, I guess, by mom or dad, doesn't have a note saying that whoever is bringing the patient in.

THE COURT: But if he has a card, they just present it and go in to be seen?

THE WITNESS: He doesn't even need a card. You just have to present your name.

THE COURT: You just sign in on the front?

THE WITNESS: Yeah, and present your name.

THE COURT: And they pull the file and take him in.

23

THE WITNESS:     And they pull the file and then they see which doctor can see them, and we see them.

THE COURT:      So you don't go through paperwork each time you come to the clinic?

THE WITNESS:     No, not if the patient has already been seen, and if that's the patient's medical home.

THE COURT:      Okay.

After this exchange, the trial court allowed Proenza to recross Dr. Grannum "just to clarify," with the following questions:

Q.      Doctor, you said that only if they brought in the patient or a guardian with authorization, that's what you mean, even if it's a follow-up.

A.      Right, but the patient has to be with a legal guardian or with the mom or dad.

Q.      Because even though it's a follow-up, you are still not to going to see—well, we are talking about a minor child. You are not going to see the child unless the parent or the guardian or someone with documentation authorized for you all to give treatment, correct?

A.      Correct.

The trial court's colloquy with Dr. Grannum continued with the following:

THE COURT:      But do you actually ask those questions?   Or do you just assume that's the parent that's bringing the child?

THE WITNESS:     No, no, no, because a lot of times, patients come without a mom or a dad, and then the triage nurse would actually come up to us and say, Doctor Grannum, this patient doesn't have a mom or dad, you know, and I mean, they come and they ask us.

THE COURT:      Is that on the first visit or in the follow up visit?

THE WITNESS:     Even on a follow-up visit, even on a follow-up visit.

THE COURT:      Okay.   Tell me about that process.

24

THE WITNESS: I'm not sure exactly what the triage nurse asks, but if it's the patient comes into the front desk, if it's not mom and it's not dad and they don't have a paper with their name on it, and I guess they present an ID showing that this is who they say they are, usually we don't see the patient.

THE COURT: Okay. So, on the follow-up visits, they have to show documentation, that's just y'all's procedure?

THE WITNESS: Right. It has to be mom or dad, or there has to be a letter that the person brings in with his or her name on it authorized by mom and dad.

THE COURT: Oh, just any letter would do saying, hey, . . . I give authority to [insert name of adult] to take my child to the clinic?

THE WITNESS: Actually, we also have a form from our clinic that we give to mom and dad if they want to send the patient with somebody else. We actually have our own form.

THE COURT: Oh, okay. But as long as you have that form, they will see the child?

THE WITNESS: And it has to be in the chart.

THE COURT: And they ask for that each time, even though the child has already been cleared for treatment?

THE WITNESS: It's—it's routine that if it's not mom and dad and if that person who is bringing the child in, if that name is not on the form, that person cannot bring the child in.

THE COURT: And is there any such form like that for [A.J.V.] . . . that was filled in at the first visit?

THE WITNESS: I can check.[4]

---

[4] At this point, the following exchange occurred,

JUROR: May I ask a question?

25

. . . .

THE COURT:         And Doctor, is that a clinic policy?

THE WITNESS:       Yes.

THE COURT:         And do you know what the purpose of that is?

THE WITNESS:       No.

. . . .

THE COURT:         So, I could show up and say that's my child, treat him.

THE WITNESS:       Right.

THE COURT:         How would you know otherwise?

THE WITNESS:       Right.   Yeah, that's a question I would have to ask the front desk.

THE COURT:         Okay.   All right. Thank you.   Because I know— maybe my doctor is very lax because they let any of my sisters and any of my brothers take my kids.

THE WITNESS:       No, we have to actually have—

THE COURT:         When I am in trial, I can't go, so—

THE WITNESS:       I am sure that can be done there once there is something written in the chart that says that those people are allowed to see your kid.

THE COURT:         You can't, I'm sorry.  You may not, but if you will write it down, I'll consider it.  Any objections to a juror asking question or writing it down?

[THE DEFENSE]:     As long it's is [sic] done in the proper way, Judge, which is through the foreperson.

THE COURT:         Well, they don't have a foreperson.

[THE DEFENSE]:     Well, not yet, but that would be my suggestion.

THE COURT:         And we need to wait until y'all are deliberating.

26

**B.     Applicable Law**

**1.     Comment on the Weight of the Evidence**

Under article 38.05 of the Texas Code of Criminal Procedure, a judge shall not discuss the evidence.   *See* TEX. CODE CRIM. PROC. ANN. art. 38.05.   Specifically,

> [i]n ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible, nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

*Id.*; *see Brown v. State*, 122 S.W.3d 794, 798 (Tex. Crim. App. 2003) (holding that a trial judge must refrain from making any remark calculated to convey his opinion of the case because jurors give special and peculiar weight to the language and conduct of the trial judge).   "The trial court improperly comments on the weight of the evidence if it makes a statement that implies approval of the State's argument, indicates disbelief in the defense's position, or diminishes the credibility of the defense's approach to the case." *Simon*, 203 S.W.3d at 590; *see Hoang*, 997 S.W.2d at 681.   If a trial judge makes an improper comment on the weight of the evidence and if error is preserved, we must then decide if the comment was material, i.e., if the jury was considering the same issue. *Simon*, 203 S.W.3d at 592.   If the comment is material, we then determine whether it rises to the level of reversible error in violation of article 38.05.   *See id.* (citing *Brokenberry v. State*, 853 S.W.2d 145, 153 (Tex. App.—Houston [14th Dist.] 1995, pet. denied)).

**2.     Preservation of Error**

The "traditional and preferred procedure" for preservation of error regarding

27

improper comments by the trial court includes: (1) objecting; (2) requesting an instruction to disregard if the prejudicial event has occurred; and (3) moving for a mistrial if a party thinks an instruction to disregard was not sufficient. *Unkart v. State*, 400 S.W.3d 94, 99 (Tex. Crim. App. 2013); *see Peavey v. State*, 248 S.W.3d 455, 470 (Tex. App.—Austin 2008, pet. ref'd); *see also Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) ("Preservation of error is a systemic requirement on appeal."). And if an issue has not been preserved for appeal, an appellate court will generally not address its merits. *Ford*, 305 S.W.3d at 532; *see* TEX. R. APP. P. 33.1(a) (providing in part that, as a prerequisite to presenting a complaint for appellate review, a timely request, objection, or motion must be made and ruled upon by the trial court); *see also Villarreal v. State*, No. 13-09-00046-CR, 2010 WL 1618649, at *3 (Tex. App.—Corpus Christi Apr. 22, 2010, no pet.) (mem. op., not designated for publication).

However, the *Unkart* Court left the door open for a judicial comment that can rise to the level of fundamental error and alleviate the need to follow the above preferred procedure for error preservation. *See Unkart*, 400 S.W.3d at 99. And being guided by Judge Keasler's concurrence in *Blue v. State* and the First Court of Appeals' reasoning in *Jaenicke v. State*, we have concluded that a defendant may complain for the first time on appeal about a trial court's lack of impartiality, as in this case—"so long as the trial judge's conduct is so egregious as to deem the judge biased on the matter . . . ." *Hernandez v. State*, 268 S.W.3d 176, 184 (Tex. App.—Corpus Christi 2008, no pet.) (finding that Hernandez could complain for the first time on appeal after determining that the trial judge's conduct—applying "an ill-conceived mathematical formula" and refusing

28

to consider the full range of punishment—was so egregious as to deem it biased on the matter of punishment) (citing *Blue*, 41 S.W.3d 129, 129–30 (Tex. Crim. App. 2000) (en banc) (Keasler, J., concurring) (discussing a defendant's right to an impartial judge at the guilt/innocence phase of the trial and reversing a conviction based on comments made by the trial court during voir dire even though Blue failed to object at trial); *Jaenicke*, 109 S.W.3d 793, 796 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (op. on reh'g) (observing that the right to an impartial judge articulated in Judge Keasler's concurrence should encompass a criminal appellant's complaint that a trial court refused to consider the full range of punishment)).

### 3.  Fundamental Error

A trial court's comments do not constitute fundamental error unless they rise to "such a level as to bear on the presumption of innocence or vitiate the impartiality of the jury." *Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001).  The *Jasper* Court recognized that several types of comments do not rise to the level of fundamental error, including those the trial court makes to correct counsel's misstatement or misrepresentation of previously admitted testimony, to maintain control and expedite the trial, to clear up a point of confusion, or to reveal irritation at counsel.  *Id.*  But Texas law discourages questioning by the trial judge in other areas because it presents two dangers: (1) the questioning could convey the judge's opinion of the case to the jury and so influence their verdict; and (2) the court "in its zeal and active participation" could assume the role of an advocate and lose the neutral and detached role that is required of a judge. *Williams v. State*, 89 S.W.3d 325, 328 (Tex. App.—Texarkana 2002, pet. ref'd); *see also*

*Long v. State*, No. 13-13-00579-CR, 2015 WL 234021, at \*4 (Tex. App.—Corpus Christi Jan. 15, 2015, no pet.) (mem. op., not designated for publication) (concluding that a trial court's questioning of two witnesses during the punishment stage of this open-plea case tried before the bench was not fundamental error because the court did not assume the role of an advocate and lose the neutral and detached role, but cautioning that the "extent and adversarial nature of the trial judge's questioning of [the witnesses was] cause for unease.").

**C.    Analysis**

Proenza asserts that "the trial judge improperly commented on the weight of the evidence" when she "continued asking question after question trying in an obvious attempt to get Dr. Grannum to say that if [Proenza] had appeared at the clinic and stated he was [A.J.V.'s] father, the child could be treated because the [c]linic would not verify that information." Proenza complains that the trial court "repeatedly questioned Dr. Grannum in an effort to get her to say that [he] could have lied to get health care for [A.J.V.]."

**1.    Comment on the Weight of the Evidence**

After the State and Proenza completed their examination of Dr. Grannum and asked that she be excused, the trial court engaged in its interrogation of the witness. The trial court asked Dr. Grannum a number of questions about the paperwork needed for a child to be seen at the clinic. The general tenor of the questions and comments indicated that the trial court sought clarification of Dr. Grannum's testimony. *See Williams*, 89 S.W.3d at 328; *see also Long,* 2015 WL 234021, at \*4. Yet the trial court's comments

30

and questions appear to have arisen from the court's personal experience with its own children's visits to a doctor, not from any confusing testimony provided by the witness because Dr. Grannum testified consistently that certain documentation was required before someone other than a parent could bring a child to be seen at the clinic. The trial court's need for clarification was based on facts known to the trial court itself—facts it interjected during the course of its exchange with Dr. Grannum. The trial court's need for clarification was not based on evidence that was before the jury. *See Clark v. State*, 282 S.W.3d 924, 928–29 (Tex. App.—Beaumont 2009, pet. ref'd) (citing *Jasper*, 61 S.W.3d at 421). The extent of the trial court's questioning and the interjection of the trial court's own experience is cause for concern. *See Williams*, 89 S.W.3d at 328. The record shows that the colloquy even engaged a juror who sought to ask a question.

Based on the above, we conclude that the trial court's comments and questions were calculated to convey to the jury the court's opinion on the procedure by which a child could be seen by any health care provider. By its comments, the trial court indicated its disbelief in Proenza's position that he thought he could not seek medical care for A.J.V. without proper documentation and diminished the credibility of Proenza's approach to the case. *See Simon*, 203 S.W.3d at 590; *Hoang v. State*, 997 S.W.2d 678, 681 (Tex. App.—Texarkana 1999, no pet.). So we conclude that the trial court improperly commented on the weight of the evidence.

Because Proenza did not object to the trial court's challenged comments on the weight of the evidence, he did not preserve error. So our review on appeal is for fundamental error. *See Unkart*, 400 S.W.3d at 99.

31

### 2. Fundamental Error and Harm

In support of his fundamental-error argument, Proenza claims that by its comments to and questions of Dr. Grannum, the trial court violated his right to a fair and impartial trial; in other words, the trial court's conduct was so egregious as to deem the judge biased on the matter of guilt, which harmed him. *See Hernandez*, 268 S.W.3d at 184; *Simon*, 203 S.W.3d at 590; *see also Unkart*, 400 S.W.3d at 99. Regarding this alleged bias, Proenza asserts that "the trial judge's comments undoubtedly influenced the jury's verdict" because (1) it negated his defensive theory by attempting to show that he could have fraudulently obtained medical care, (2) "the jury could not help but be swayed by [the trial court's] shocking comments on the weight of the evidence," and (3) his "substantial right to a fair and impartial trial was violated by the one person who was to remain neutral." *See Simon*, 203 S.W.3d at 590.

It is apparent from our review of the record that the trial court believed the procedure for children to be seen for medical care was different from the procedure described by Dr. Grannum. This witness testified that authorization from the parent was required before a child would be seen at the clinic where she was employed and where A.J.V. had been seen as a patient. The trial court challenged this testimony. For example, the trial court asked of Dr. Grannum, "[D]o you just assume that's the parent that's bringing the child?", and commented, "[M]aybe my doctor is very lax because they let any of my sisters and any of my brothers take my kids . . . [w]hen I am in trial." The jury also heard Dr. Grannum respectfully disagree with the trial court's comments. As discussed above, the trial court was not attempting to clarify any points of confusion

32

created by Dr. Grannum's testimony. *See Jasper*, 61 S.W.3d at 421. Dr. Grannum testified consistently that a parent needed to bring his child or to give permission to another to do so. The trial court was not asking Dr. Grannum to repeat something it did not hear. And we cannot conclude that the trial court's comments fit within any other category set forth in *Jasper*, such that they would not have risen to the level of fundamental error. *See id.* For example, the trial court was not attempting to correct a misrepresentation or misstatement by counsel of previously admitted testimony. *See id.* Finally, it was not making comments to maintain control and expedite the trial or to reveal its irritation at counsel. *See id.*

The trial court's frequent participation through questions and comments that cover almost one-third of Dr. Grannum's twenty-seven pages of testimony tended to give the jury the impression that the trial court disbelieved this witness's testimony and, thus, cast doubt on Proenza's defensive theory that he needed the permission of the baby's mother before he could take A.J.V. to the clinic. "[I]n its zeal and active participation" the trial court assumed the role of an advocate and lost the neutral and detached role that is required of a judge. *See Williams*, 89 S.W.3d at 328; *see also Long*, 2015 WL 234021, at *4. The trial court's questions and remarks, including the court's interjection of facts based on its own experience, were unnecessary. The parties were satisfied that Dr. Grannum's testimony was complete and had asked that the court release her as a witness. It was only then that the complained-of exchange began. We conclude that the comments of the trial court, which tainted not only Proenza's defensive theory but also the presumption of his innocence in front of the jury or vitiated the jury's impartiality,

33

were fundamental error and required no objection. *See id.*

The trial court's questioning conveyed its opinion to the jury regarding one of the main issues of the case—Proenza's failure to seek medical care for A.J.V.—and so influenced the jury's verdict. *See Williams*, 89 S.W.3d at 328; *see also Long*, 2015 WL 234021, at *4. The trial court's comments showed lack of impartiality; they showed bias so egregious as to deem the trial court biased on the matter of Proenza's guilt. *See Hernandez*, 268 S.W.3d at 184; *Simon*, 203 S.W.3d at 590; *see also Unkart*, 400 S.W.3d at 99. And we cannot say beyond a reasonable doubt that the trial court's error did not contribute to Proenza's conviction.[5] *See* TEX. R. APP. P. 44.2(a) (stating that when reviewing constitutional error for harm, the court must reverse unless it determines

---

[5] The dissent concludes that the error was harmless because "the state of the evidence" rendered the trial judge's comments "virtually inconsequential" as to whether Proenza committed the crime. Specifically, the dissent reasons that even if the trial judge's comments negated Proenza's defensive theory that Su Clinica would not have treated the child without parental authorization, the jury was still "overwhelmingly likely" to have found Proenza guilty because "he did not offer any explanation" for why he failed to take the child to the emergency room, even though "undisputed" evidence showed that he could have done so without parental authorization. We disagree with the dissent's harmless-error analysis for three reasons. First, under Texas Rule of Appellate Procedure 44.2(a), we must reverse a non-structural constitutional error "unless [we] determine [] beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *See* TEX. R. APP. P. 44.(2)(a). Under this standard, "it is the State's burden, as beneficiary of the error, to prove the error is harmless beyond a reasonable doubt." *Davis v. State*, 195 S.W.3d 311, 317 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (citing *Chapman v. California*, 386 U.S. 18, 23–24 (1967)). In this case, the State has made no attempt to explain why the error was harmless beyond a reasonable doubt. And by requiring Proenza to offer an explanation for why he allegedly failed to take the child to the emergency room, the dissent has in essence shifted the burden onto him to prove the issue of harm. Second, we do not agree with the dissent that the evidence "undisputedly" showed that Proenza could have obtained emergency medical care without parental authorization; and even if Proenza could have done so, that fact alone does not defeat the reasonable possibility that the trial judge's comments, which showed a lack of impartiality and bias in favor of the State, "moved the jury from a state of nonpersuasion to one of persuasion" on the matter of Proenza's guilt. *See Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000) (observing that constitutional error is not harmless beyond a reasonable doubt "if there was a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question"). Third, we do not share the dissent's confidence that the error was harmless because the evidence of guilt by omission in this case was less than overwhelming. *See id.* (noting that "the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error").

34

beyond a reasonable doubt that the error did not contribute to the conviction or the punishment); *Blue v. State*, 64 S.W.3d 672, 673 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (op. on remand) (finding that it could not say beyond a reasonable doubt that the error of the trial court had not contributed to the conviction).

**D.     Summary**

We sustain Proenza's second issue.[6]

### III.     CONCLUSION

We reverse the conviction and remand for proceedings consistent with this opinion.

NELDA V. RODRIGUEZ
Justice

Dissenting Opinion by Justice Garza.

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
23rd day of July, 2015.

---

[6] Given our disposition of this issue, we need not address the remaining issues and sub-issues, which include challenges to the trial court's denial of Proenza's motion to recuse and its use of "confession" to describe Proenza's recorded interview with law enforcement.   *See* TEX. R. APP. P. 47.1.