OPINION ON REMAND
Opinion on Remand by Justice Rodriguez *392 Appellant Abraham Jacob Proenza challenges his conviction for injury to a child, four-month-old A.J.V.,[2] by omission, a first-degree felony. See TEX. PENAL CODE ANN. § 22.04(a)(1), (b)(2), (e) (West, Westlaw through 2017 1st C.S.). The jury returned a guilty verdict and assessed punishment at forty years in the Texas Department of Criminal Justice-Institutional Division.
This case is now before us on remand from the Texas Court of Criminal Appeals. See Proenza v. State, 471 S.W.3d 35 (Tex. App.-Corpus Christi 2015), aff'd in part & rev'd & remanded in part , 541 S.W.3d 786, 788 (Tex. Crim. App. 2017). The court of criminal appeals affirmed our judgment to the extent we concluded that Proenza's statutory judicial-comment challenge could be raised for the first time on appeal. Proenza v. State , 541 S.W.3d 786, 801 (Tex. Crim. App. 2017) ; see TEX. CODE CRIM. PROC. ANN. art. 38.05 (West, Westlaw through 2017 1st C.S.) (providing that the trial judge must not "make any remark calculated to convey to the jury his opinion of the case"). But because Proenza claimed only a statutory violation that called for a non-constitutional harm analysis, the Texas Court of Criminal Appeals held that we "should have applied the harm analysis contained in Texas Rule of Appellate Procedure 44.2(b)," not the constitutional-error harm standard under rule 44.2(a). Proenza , 541 S.W.3d at 801 ; see TEX. R. APP. P. 44.2. Noting that our "ultimate determination that Proenza was harmed was [not] incorrect per se," the court remanded the case to this Court with instructions to revisit our harm analysis. Proenza , 541 S.W.3d at 802. Following our nonconstitutional harm analysis, we reverse and remand.
I. BACKGROUND [3]
Proenza and his wife Sandra testified that on April 2, 2008, A.J.V. was born in Minnesota to Sandra's sister. Hoping to adopt A.J.V., Proenza and Sandra drove to Minnesota and returned to Texas with the child.
When A.J.V. was three or four weeks old, Sandra and A.J.V.'s birth mother, who was in Texas at the time, took A.J.V. to Su Clinica. A.J.V.'s birth mother signed medical consent forms for A.J.V. but did not sign papers authorizing anyone else, including Proenza or Sandra, to take A.J.V. for medical care. Proenza testified that he and Sandra expected A.J.V.'s birth mother to sign the papers before she left Texas in June 2008 but she did not. Proenza also *393 explained that on one occasion his father-in-law was asked to take one of his daughters to Su Clinica for a scheduled appointment "and he was denied because he wasn't on her slip on her folder." Proenza believed that, without the mother's permission, he would not be able to take A.J.V. to his next scheduled appointment at Su Clinica.[4] Proenza thought that if he took A.J.V. for medical care they would not see the child because Proenza did not have proper documentation from A.J.V.'s birth mother.
Proenza and Sandra also testified that they raised A.J.V. together until Sandra went to Minnesota to work, leaving A.J.V. and their three-year-old daughter in Proenza's care and their one-year-old daughter in Sandra's mother's care. They enrolled their daughters in a daycare, but according to both Sandra and Proenza, they could not enroll A.J.V. there because they could not show legal guardianship or adoption and they did not have A.J.V.'s birth mother's signature on the daycare forms. According to Proenza, he and his wife could not reach A.J.V.'s mother because she would not answer their calls and later changed her phone number.[5]
Around this same time, J.S.M., Proenza and Sandra's fifteen-year-old nephew and the baby's half-brother, began staying with Proenza. According to Proenza, he showed J.S.M. how to care for A.J.V., and J.S.M. acknowledged that he understood. Proenza testified that J.S.M. cared for the baby when Proenza was not at home and when Proenza was there but "separate with [his] girls." Proenza also testified that on the Wednesday before A.J.V. passed away, he enrolled in a business school and asked J.S.M. to care for A.J.V. while he was attending classes.
According to Proenza, on August 11, 2008, when he returned home from school, J.S.M. told him that he had fed and bathed A.J.V. Later that evening, Proenza put A.J.V. to bed, but when he checked on him fifteen minutes later, A.J.V. was blue and purple in color and his mouth was open. Proenza began CPR, and J.S.M. called 911. The EMS transported A.J.V. to the hospital. Proenza later learned that A.J.V. had passed away.
Proenza testified that he never knew that J.S.M. had mishandled A.J.V. Proenza related that on August 11, 2008, A.J.V. did not look like he was dying "at all." He had been throwing up, but not a whole bottle of *394 formula. Proenza explained that he did not take A.J.V. to the hospital or Su Clinica because he thought the medical facilities would turn him away without proper documentation.
Long-time friends of the Proenzas, Mandy Cantu and her husband Armando Vela Jr., testified for the defense. Cantu and Vela set out that they had seen A.J.V. on three different occasions and that "he looked fine." Proenza's parents, Ramon and Rosalinda Proenza, explained that when they saw A.J.V., although Rosalinda understood he was "throwing up a lot," both described him as either "fine" or "okay." Proenza's friend Aaron Villarreal testified that he saw A.J.V. in July and thought he was "real small" but agreed that he saw nothing wrong with the baby at that time. When he saw A.J.V. a month later, after Hurricane Dolly, he "looked a little bit skinnier," was "really frail," and looked like "a baby, who hadn't developed." Villarreal explained that, at the time, A.J.V. was "tired" and "cranky" like all the other kids. Finally, Helen Rodriguez, pastor of the church where Proenza was a member, testified that, on three occasions, she saw Proenza at church with his daughters and A.J.V. According to Rodriguez, Proenza cared for the baby at the church. When Rodriguez saw A.J.V., she thought he "looked perfectly." She had no concerns about A.J.V.'s health or welfare.
Norma Jean Farley, M.D., a forensic pathologist for Hidalgo County who conducted an autopsy on A.J.V., testified for the State. She agreed that A.J.V.'s cause of death was dehydration and malnutrition, which could not have happened overnight, and that the conditions of each were "very obvious." Regarding malnutrition, Dr. Farley explained that there would be apparent physical changes occurring, including "the way the physique of how the child looked when he changed the diaper [or bathed the child]. You would notice, you know, the folds on the buttocks, the fact that the ribs are very prominent." When asked to give an approximate time since the child had eaten, Dr. Farley responded, "probably in the last 24 hours" because she found only a small pepper in his intestines. Dr. Farley also testified that A.J.V. exhibited signs of dehydration; a depressed soft spot, sunken eyes, dry mucus membrane on the inside of the eyes and lips, and poor skin turgor. She explained that dehydration occurs faster in infants, especially in an infant with diarrhea. According to Dr. Farley, "if the family waits and doesn't take it to the doctor, it could be dehydrated the next morning and really need water quickly." Dr. Farley agreed that A.J.V. "may have survived, especially with just fluids."
The State also called Carol Grannum, M.D., a pediatrician employed at Su Clinica, to testify. She explained that the clinic's medical records showed that A.J.V. was first seen on April 17, 2008, when he was fifteen days old. According to Dr. Grannum, between that visit and subsequent visits, including his last follow-up visit on June 10, 2008, A.J.V. was progressing as he should be.
On cross examination, Dr. Grannum agreed that if someone, other than a parent, tried to take a child to the clinic, the child could not be seen, even for a follow-up appointment. On re-direct examination, speaking of patients generally, Dr. Grannum testified that if a patient came to the clinic in distress, "we would say ... if we can't take care of the situation here, we will call the ambulance and the patient will be ... transferred to the hospital, to the Emergency Room...." She agreed that she would not "deny a patient." And on re-cross, while agreeing that she was not committing to treat the patient "right on the spot," she explained that "if the patient *395 were in acute distress," she would go to the front desk and say, "you need to go to the Emergency Room right away and we will call EMS." Dr. Grannum also explained that if the patient was in acute distress, they would stabilize him first and then call EMS.
After counsel for Proenza and counsel for the State indicated they had no further questions and asked that the witness be excused, the trial court entered the following complained-of colloquy with Dr. Grannum:
THE COURT: Ma'am, once the child is a registered patient of the clinic, what do you all require for documentation on follow-up visits.
THE WITNESS: Meaning if the patient needs to come back, we would give them a little note saying you [are] due back in a week or in two weeks or two months.
THE COURT: So in this case, you had given [A.J.V.] a follow-up appointment.
THE WITNESS: Yes.
THE COURT: When he-when [A.J.V.] is presented for his return visit, what do you require if anything, for the child to be seen?
THE WITNESS: We would see the patient unless the patient wasn't brought in, I guess, by mom or dad, doesn't have a note saying that whoever is bringing the patient in.
THE COURT: But if he has a card, they just present it and go in to be seen?
THE WITNESS: He doesn't even need a card. You just have to present your name.
THE COURT: You just sign in on the front?
THE WITNESS: Yeah, and present your name.
THE COURT: And they pull the file and take him in.
THE WITNESS: And they pull the file and then they see which doctor can see them, and we see them.
THE COURT: So you don't go through paperwork each time you come to the clinic?
THE WITNESS: No, not if the patient has already been seen, and if that's the patient's medical home.
THE COURT: Okay.
After this exchange, the trial court allowed Proenza to re-cross Dr. Grannum "just to clarify," with the following questions:
Q. Doctor, you said that only if they brought in the patient or a guardian with authorization, that's what you mean, even if it's a follow-up.
A. Right, but the patient has to be with a legal guardian or with the mom or dad.
Q. Because even though it's a follow-up, you are still not to going to see-well, we are talking about a minor child. You are not going to see the child unless the parent or the guardian or someone with documentation authorized for you all to give treatment, correct?
A. Correct.
Following this re-cross examination, the following exchange occurred between the trial court and Dr. Grannum:
THE COURT: But do you actually ask those questions? Or do you just assume that's the parent that's bringing the child?
THE WITNESS: No, no, no, because a lot of times, patients come without a mom or a dad, and then the triage nurse would actually come up to us and say, Doctor Grannum, this patient *396 doesn't have a mom or dad, you know, and I mean, they come and they ask us.
THE COURT: Is that on the first visit or in the follow up visit?
THE WITNESS: Even on a follow-up visit, even on a follow-up visit.
THE COURT: Okay. Tell me about that process.
THE WITNESS: I'm not sure exactly what the triage nurse asks, but if it's the patient comes into the front desk, if it's not mom and it's not dad and they don't have a paper with their name on it, and I guess they present an ID showing that this is who they say they are, usually we don't see the patient.
THE COURT: Okay. So, on the follow-up visits, they have to show documentation, that's just y'all's procedure?
THE WITNESS: Right. It has to be mom or dad, or there has to be a letter that the person brings in with his or her name on it authorized by mom and dad.
THE COURT: Oh, just any letter would do saying, hey, ... I give authority to [insert name of adult] to take my child to the clinic?
THE WITNESS: Actually, we also have a form from our clinic that we give to mom and dad if they want to send the patient with somebody else. We actually have our own form.
THE COURT: Oh, okay. But as long as you have that form, they will see the child?
THE WITNESS: And it has to be in the chart.
THE COURT: And they ask for that each time, even though the child has already been cleared for treatment?
THE WITNESS: It's-it's routine that if it's not mom and dad and if that person who is bringing the child in, if that name is not on the form, that person cannot bring the child in.
THE COURT: And is there any such form like that for [A.J.V.] ... that was filled in at the first visit?
THE WITNESS: I can check.
JUROR: May I ask a question?
THE COURT: You can't, I'm sorry. You may not, but if you will write it down, I'll consider it. Any objections to a juror asking question or writing it down?
[THE DEFENSE]: As long it's is [sic] done in the proper way, Judge, which is through the foreperson.
THE COURT: Well, they don't have a foreperson.
[THE DEFENSE]: Well, not yet, but that would be my suggestion.
THE COURT: And we need to wait until y'all are deliberating.
THE COURT: And Doctor, is that a clinic policy?
THE WITNESS: Yes.
THE COURT: And do you know what the purpose of that is?
THE WITNESS: No.
...
THE COURT: So, I could show up and say that's my child, treat him.
THE WITNESS: Right.
THE COURT: How would you know otherwise?
THE WITNESS: Right. Yeah, that's a question I would have to ask the front desk.
THE COURT: Okay. All right. Thank you. Because I know-maybe my doctor is very lax because they let any of my sisters and any of my brothers take my kids.
THE WITNESS: No, we have to actually have- *397 THE COURT: When I am in trial, I can't go, so-
THE WITNESS: I am sure that can be done there once there is something written in the chart that says that those people are allowed to see your kid.
THE COURT: Because you are actually the one that is going to treat somebody.
THE WITNESS: Right, but I work at Su Clinica, it's not my private clinic, and the front desk sets their rules.
THE COURT: I see.
THE WITNESS: And we follow orders. It's not my own clinic, I'm sorry.
II. IMPROPER COMMENT
By Proenza's remand issue which was his second appellate issue, Proenza contends that the trial court's improper comments violated Texas Code of Criminal Procedure article 38.05. See TEX. CODE CRIM. PROC. ANN. art. 38.05. He claims that the trial court's comments caused him irreparable harm and warrant reversal under Texas Rule of Appellate Procedure 44.2(b). See TEX. R. APP. P. 44.2(b).
A. Error Analysis
A judge shall not, "at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case." TEX. CODE CRIM. PROC. ANN. art. 38.05 ; see Brown v. State , 122 S.W.3d 794, 798 (Tex. Crim. App. 2003) (holding that a trial judge must refrain from making any remark calculated to convey his opinion of the case because jurors give special and peculiar weight to the language and conduct of the trial judge). By creating "a duty on the trial court ... to refrain sua sponte from a certain kind of action," article 38.05 provides the defendant with a right to be tried in a proceeding devoid of improper judicial commentary. See Proenza , 541 S.W.3d at 798, 801. "The trial court improperly comments on the weight of the evidence if it makes a statement that implies approval of the State's argument, indicates disbelief in the defense's position, or diminishes the credibility of the defense's approach to the case." Simon v. State , 203 S.W.3d 581, 590 (Tex. App.-Houston [14th Dist.] 2006, no pet.).
Although the court of criminal appeals did not expressly conclude that the trial court erred when it interacted with Dr. Grannum, it wrote,
As to the entirety of this exchange between the trial judge and Dr. Grannum, the State concedes, and we agree, that the court's tone is fairly characterized as disapproval of the wisdom of such a practice and/or doubt that the policy is enforced as strictly as suggested by [Dr.] Grannum.
Proenza , 541 S.W.3d at 790 (internal quotations omitted).
Based on the above, we again conclude that the trial court improperly commented on the weight of the evidence in violation of article 38.05 because
the trial court's comments and questions were calculated to convey to the jury the court's opinion on the procedure by which a child could be seen by any health care provider. By its comments, the trial court indicated its disbelief in Proenza's position that he thought he could not seek medical care for A.J.V. without proper documentation and diminished the credibility of Proenza's approach to the case.
Proenza , 471 S.W.3d at 53 (citations omitted).
B. Harm Analysis
Proenza further contends that his substantive rights were affected because the *398 trial court's comments had an injurious effect or influence in determining the jury's verdict. The substantial rights that Proenza claims were affected include his "right to a fair trial, his right to the presumption of innocence, his right to present a defensive theory without biased comment from the trial judge, and his right to be tried by an impartial jury."
The State responds that "[i]n light of the powerful evidence supporting the verdict and the arguments of the parties, [Proenza's] 'Su Clinica' defense was not a factor"; "the case did not hinge on [Proenza's] failure to obtain medical care for the child." Instead the State claims that "[e]ven if the trial court gutted [Proenza's] 'Su Clinica' defense, the overwhelming evidence shows that [he] did not feed an infant in his care for an extended period, and the child died as a result." The State reasons that "[t]he failure to seek medical care for the child was collateral to his knowledge the child was not being fed."
1. Applicable Law and Standard of Review
When a statutory violation is claimed, any "error must be treated as nonconstitutional for the purpose of conducting a harm analysis" and must be reviewed under " Texas Rule of Appellate Procedure 44.2(b), the non-constitutional standard for reversible error in criminal cases." Proenza , 541 S.W.3d at 801. Under rule 44.2(b), any "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). In other words, nonconstitutional error requires reversal only if it affects the substantial rights of the accused. Id. ; see Barshaw v. State , 342 S.W.3d 91, 93 (Tex. Crim. App. 2011) ; see also Steen v. State , No. 13-14-00547-CR, 2016 WL 873010, at *2 (Tex. App.-Corpus Christi, Feb. 18, 2016, pet. ref'd) (mem. op., not designated for publication).
"A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." Ellis v. State , 517 S.W.3d 922, 931 (Tex. App.-Fort Worth 2017, no pet.) ; see also Steen , 2016 WL 873010, at *2. Stated differently,
[t]his court will not overturn a criminal conviction for non-constitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or influenced the jury only slightly. In considering the potential to harm, the focus is not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect or influence on the jury's verdict. A conviction must be reversed for non-constitutional error if the reviewing court has grave doubt that the result of the trial was free from the substantial effect of the error. Grave doubt means that in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error. In cases of grave doubt as to harmlessness the petitioner must win.
Barshaw , 342 S.W.3d at 93-94 (quotations and citations omitted).
We review the entire record to ascertain the effect or influence on the verdict of the error. Id. at 93. We consider "testimony, physical evidence, jury instructions, the State's theories and any defensive theories, closing arguments, and voir dire, if applicable." Schmutz v. State , 440 S.W.3d 29, 39 (Tex. Crim. App. 2014) (citing Bagheri v. State , 119 S.W.3d 755, 763 (Tex. Crim. App. 2003) ). We also consider "the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case, and *399 may include whether the State emphasized the error and whether overwhelming evidence of guilt was present." Id. ; Barshaw , 342 S.W.3d at 94. "While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error." Wesbrook v. State , 29 S.W.3d 103, 119 (Tex. Crim. App. 2000) (en banc); Simon , 203 S.W.3d at 593. Neither party has the burden to prove or disprove harm; instead, it is the responsibility of the reviewing court, once it concludes there was error, to determine whether the error affected the judgment. Johnson v. State , 43 S.W.3d 1, 5 (Tex. Crim. App. 2001) (en banc).
2. Discussion
By this appellate issue, Proenza claims that the trial court's questioning of Dr. Grannum for almost ten pages of the record served to discredit his defensive theory, rebut his presumption of innocence, and sway the jury's verdict. He asserts that the improper comments were reasonably calculated to benefit the State or to prejudice the defendant's right to a fair and impartial trial.
a. Trial court's comments
We begin our harm analysis by reviewing the trial court's complained-of comments. One of the most fundamental components of a fair trial is "a neutral and detached judge," one who is fair and impartial and who does not act as an advocate for either party. Simon , 203 S.W.3d at 593-95 (quoting Metzger v. Sebek , 892 S.W.2d 20, 37-38 (Tex. App.-Houston [1st Dist.] 1994, writ denied) ). While nothing suggests the trial court intended any adverse consequences, we conclude that its comments alerted the jury to the trial court's opinion on a material fact issue raised by the evidence-whether the medical staff at Su Clinica would have treated A.J.V. had Proenza taken him to the clinic without the written consent of his birth mother.
During the trial court's exchange with Dr. Grannum, it injected new facts into the record and, in the process, became an advocate for the State with its actions and conduct inuring to the State's benefit. This not only impacted the state of the evidence but also the dynamics of the trial. See id. at 594. The trial court's ongoing exchange with this witness, including its comments about how relatives take the court's own children to the children's doctor's appointments, "bespoke a distinct negativity toward [Proenza's] position that almost certainly did not escape the jury's notice." Id. The court's complained-of comments regarding its children's access to medical care were not isolated or neutral comments. See id. Because of the trial court's comments, the jury could have been influenced in favor of the State and against Proenza on his defensive theory that he could not seek medical care for A.J.V. without the consent of A.J.V.'s mother.
b. Voir dire
We also review voir dire where the trial court began by welcoming the jurors and reading the indictment. As reflected in the indictment, Proenza was charged with serious bodily injury to A.J.V. under two theories of omission-failing to feed the child and/or failing to seek medical care for him.
After the State inquired whether the members of the jury understood that injury to a child can be something you do to or fail to do for the child, the trial court asked one juror, "Can you imagine a case where you hurt somebody by not doing something?" to which the juror answered, "Yes." Later, after the State's discussion of the definition of serious bodily injury and after an off-the-record bench discussion *400 with counsel, the trial court addressed the jury saying,
Ladies and gentlemen of the jury, I had counsel approach because I think in order to be able to have you understand the kind of case you are going to be trying, that we should disclose to you that as a result of the injuries to the child or the omission, the child died. So, I think that's important for you to know when you sit in judgment of this case, okay? So the omission is-because of the omission to the child, the child died. Go ahead.
(Emphasis added.)
Although the trial court may have only wanted the jury to know that this case involved the death of a child, the trial court's comment informed the jury that because of Proenza's omissions A.J.V. died.[6] This comment alerted the venire to the court's apparent opinion regarding an element of the charged offense. See TEX. PENAL CODE ANN. § 22.04(a). The statement benefitted the State because it lessened its burden of proof regarding causation, which is the same element of the offense that the trial court's later improper comments bore upon. See Clark v. State , 878 S.W.2d 224, 226 (Tex. App.-Dallas 1994, no pet.).
Also, during voir dire, while Proenza's counsel acknowledged that the child died, he had an extensive discussion with a prospective juror regarding Proenza's defensive theory-the difficulty of taking another person's child to a hospital for treatment. In other words, during voir dire, Proenza emphasized his defensive theory as to the alleged omission.
c. Opening arguments
During opening arguments, the State set out its two theories of omission:
The evidence will show that Mr. Proenza just didn't care for [A.J.V.]. The evidence will show that he didn't have any kind of feeding schedule, didn't know when he was fed, didn't feed him himself. Also showed that not one night did he ever get up and feed Baby [A.J.V.] in the middle of the night. Never woke up to make a bottle, can't tell you when he ate. All in all, Mr. Proenza was responsible for Baby [A.J.V.].
...
The evidence will show that all of that came to a halt on August 11, 2008 when a 911 call was placed for a baby boy not breathing. EMS were called out, and Baby [A.J.V.] was placed in the ambulance and rushed to Valley Baptist Medical Hospital [where] ... he was pronounced dead after just a few minutes, even being at the hospital. And you will hear that doctors and officers immediately noticed how skinny Baby [A.J.V.] was. The doctors noted immediately that he looked malnourished. And you will hear from the autopsy pathologist, Doctor Norma Farley, who did the autopsy on Baby [A.J.V.], and you will hear what her findings are. You will hear that at death, at four months old, Baby [A.J.V.] weighed only 8 pounds.... The loose skin and protruding bones are hard to miss, and you will be able to see those photos for yourself. You will also hear *401 that Doctor Farley made a determination on his cause of death. And Baby [A.J.V.'s] sole cause of death was malnourishment and dehydration. Baby [A.J.V.] starved to death under his care. You will hear that Mr. Proenza knew [A.J.V.] needed to go to the doctor. We expect that you will hear that Baby [A.J.V.] actually had a scheduled doctor's appointment at Su Clinica for immunization. He knew he had a doctor's appointment, and he chose not to take him. He didn't take him. So already scheduled, already set up, he made that decision. You will hear that that same clinic, the same place, they would take all their kids, all their family went there, he even went to that same clinic. You will hear that Mr. Proenza knew it was his responsibility to feed that child. It was his responsibility to care for that child. He could have taken him to see a doctor, he should have taken him to see a doctor, and he didn't.
The above quoted portion of the record reflects that the State highlighted the importance of both theories of omission beginning with its opening argument. It did not rely only on one theory-failing to feed the child-when it opened the trial.
d. The evidence
In conducting this harm analysis, we also consider any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and how this evidence might be considered in connection with the other evidence in the case. See Barshaw , 342 S.W.3d at 94.
The State argues that,
the harm analysis does not hinge on [Proenza's] access to Su Clinica because the case did not hinge on [his] failure to obtain medical care for the child.
[Proenza] argues harm as though this is a typical "failure to seek medical care" case. It is not. In a typical case, the defendant fails to seek medical care after the victim suffers from an illness or is injured in an accident. [Proenza's] case is different. He was charged not only with failing to seek care for the child but with causing the condition that killed him. Although the jury may not have been unanimous as to either manner and means, it convicted appellant of intentionally or knowingly causing serious bodily injury to a child over whom he had assumed care. On the facts of the case, its finding was as good to one manner and means as it was to the other. In light of the powerful evidence supporting the verdict and the arguments of the parties, appellant's "Su Clinica" defense was not a factor.
(Citations omitted).[7]
We held in our original opinion, that the evidence was sufficient to support Proenza's *402 conviction, and the court of criminal appeals did not disturb that holding. See Proenza, 471 S.W.3d at 47. And we are not persuaded by the State's argument that *403 the jury's potential lack of unanimity as to either manner and means indicates that Proenza's " 'Su Clinica' defense was not a factor." The State provides no support for its argument.
The focus of our review of this judicial-comment issue is not on whether the outcome of the trial was proper despite the error, which is what the State is arguing; our review focuses on whether the error had a substantial or injurious effect or influence on the jury's verdict. See Barshaw , 342 S.W.3d at 93-94. While the existence of substantial evidence of guilt may be a factor in our harm analysis, we consider all of the evidence admitted, the nature of the evidence supporting the verdict, the character of the error, and how the error might be considered in connection with other evidence in the case. See ids="7318467" index="32" url="https://cite.case.law/sw3d/342/91/#p93">id. ; see also Simon , 203 S.W.3d at 593.
e. Closing arguments
In this harm determination, we also review the closing arguments. The State argues that the closing arguments treated Proenza's intentional and knowing acts "holistically." It further argues that its focus was on Proenza's failure to feed the child and, therefore, any judicial comments concerning Proenza's failure to obtain medical care were likely harmless. We disagree that the State's emphasis was placed solely on failure to feed.
When the State closed at trial, it first argued that it had proven the elements of the offense based on both theories of omission. For example, in discussing its proof of "[i]ntentionally or knowingly, by omission," the State explained as follows:
Not feeding your child, not taking your child to the hospital, reasonably certain it's going to result in death. And that's why we're here. By omission. "Omission" is the failure to act, the failure to feed him, the failure to care for him, the failure to take him to go get the medical treatment that he needed, that's why we're here. So it's a combination of those two. Reasonably certain that the act was going to cause the result. Don't feed your child, don't take him to the doctor, he's going to die. It's reasonably certain that it could cause that result. And you heard from all the evidence about that. You heard from Dr. Farley. You heard from him, himself, saying, "I know if I don't feed the kid the child is going to die." ... "By failing to feed and/or failing to seek medical care for [A.J.V.]." We don't need to prove both. Do not need to prove failing to feed and failing to seek medical care. Either one. You can find either one. This aspect, you also don't need to be unanimous. Some of you feel the failure to feed, some of you feel the failure to seek medical care. We have proven our case to you beyond a reasonable doubt. We have met that element.
Other excerpts of the State's closing arguments follow, many of which referenced both acts of omission:
He's aware that if you do not feed your child, you do not take your child to the hospital, that is reasonably certain to result in death.
...
But we are alleging that he knew that [A.J.V.] wasn't eating right. He knew that he wasn't taking care of [A.J.V.]. He ignored [A.J.V.].
...
And he admitted, he knows that if you don't feed the baby, he's going to die, and the conduct he does is going to result in death. He knew that.
...
He did cause serious bodily injury. He killed him. Caused his death by malnutrition and dehydration.... This is a *404 child that died because he wasn't fed. When he was deteriorating, he was not taken to the hospital and it was obvious he was going to die if he didn't get some care. All of the medical people told you if this child would have been brought to them, they would have either cared for him or contacted the EMS services that would have come to care for him. He would have been alive if he had gotten some care.
...
[Defense] Counsel also said that if the papers were signed, if [A.J.V.'s birth mother] just would have done it, we wouldn't be here today. How do you know that? Having papers signed would have caused him to feed [A.J.V.] more regularly, would it have caused him to love him more?
...
We're asking you to find him guilty, that he intentionally or knowingly caused serious bodily injury by omission, failing to feed him, failing to get medical care for this child that he assumed responsibility for, and failed miserably. Thank you.
Proenza's counsel began his closing argument by reminding the jury that it was being asked to determine only if the omissions caused serious bodily injury, not death. He recapped that he had asked Dr. Farley if A.J.V. had been taken to the hospital if he would have survived, to which she answered, " 'Don't know if the baby would have survived or not.' "[8] Addressing the intentional or knowing element, counsel stated, "There's no question that the baby was skinny. But do we have any evidence that the condition that he was in was so dire that anybody, any one of us would have taken the child to the emergency room at that point?" According to counsel, Proenza "did not see the baby in such a condition that [he] thought it was imminent or that the baby was going to immediately die." Importantly, he emphasized Proenza's defensive theory to the jury-that Proenza "attempted every which way to get the documents from [the birth] mother, so that he could take the child to Su Clinica, so he could take the child to the hospital" and that if "[the mother] signed the documentation from the very beginning, we wouldn't be standing here talking to you."
While the closing arguments addressed the elements of the offense, we cannot agree that the focus of the arguments was only on Proenza's failure to feed the child. The State discussed both theories of omission throughout its argument. And Proenza emphasized his defensive theory. In other words, at the end of the trial and immediately before its deliberations, the jury was reminded of Proenza's alleged failure to feed the child and of his alleged failure to seek medical care for him.
f. Summary
We cannot say with fair assurance that the trial court's comments did not influence the jury's decision or had only a slight effect. See TEX. R. APP. P. 44.2(b). Upon reviewing the entire trial record to determine the effect or influence of the trial court's comments on the verdict, we have grave doubt that the result of the trial was free from the substantial effect of the error. See Barshaw , 342 S.W.3d at 94. The subject of the extended exchange between the trial court and the State's witness related directly to a defensive theory. The court conveyed its opinion to the jury *405 regarding one of the main issues of the case-whether Proenza's failure to seek medical care for A.J.V. caused the child to suffer injury. This, combined with the character of the judicial error; its effect on Proenza's defense to the failure-to-seek-medical-care theory of the case; the court's voir dire explanation that the case involved the death of a child, a death that was caused by omissions that included failure to seek medical care; arguments by both sides that emphasized the two theories of omission as well as Proenza's defensive theory; and the evidence before the jury that was not overwhelming on the matter of medical-care consent, leads us to conclude that the comments by the trial court more than slightly influenced the verdict. See Barshaw , 342 S.W.3d at 93 ; see also TEX. R. APP. P. 44.2(b) ; Steen , 2016 WL 873010, at *2.
Based on the above, we conclude that the trial court's error affected Proenza's substantial right to a fair trial, his right to the presumption of innocence, his right to present a defensive theory without biased comment from the trial judge, and his right to be tried by an impartial jury. See TEX. R. APP. P. 44.2(b) ; Barshaw , 342 S.W.3d at 93 ; see also Steen , 2016 WL 873010, at *2. The trial court's error was harmful. We sustain Proenza's issue on remand.[9]
III. CONCLUSION
We reverse the conviction and remand for proceedings consistent with this opinion.

We use initials to identify the minors in this case.

Other background facts are set out in the prior opinion of this Court and the opinion of the court of criminal appeals with its appendix. See Proenza v. State , 471 S.W.3d 35 (Tex. App.-Corpus Christi 2015), aff'd in part & rev'd & remanded in part , 541 S.W.3d 786, 788 (Tex. Crim. App. 2017).

A.J.V.'s Su Clinica medical records show that A.J.V. was seen at the clinic on April 17, April 27, April 29, June 3, and June 10, 2008 and that he missed a May 29, 2008 appointment, which was rescheduled for June 2. And according to A.J.V.'s missed appointment medical-records sheet, on August 4, 2008, A.J.V. needed an appointment in one to two days; on August 6, 2008 an appointment card was mailed; and on August 12, 2008 A.J.V. missed his appointment. Investigator and Lead Agent Daniel Valerio of the Cameron County Sheriff's Office testified that he found a Su Clinica appointment card for A.J.V. in Proenza's home. According to Investigator Valerio, the appointment date was August 4, 2008. Proenza testified that he was aware of a scheduled appointment but did not testify as to the date.
A.J.V.'s medical records also contain a general disclosure/consent and authorization form for A.J.V.'s health care services that he would receive at Su Clinica. A.J.V.'s birth mother signed the form on April 17, 2008, the same day as A.J.V.'s first visit to the clinic.

Proenza's mother, Rosalinda Proenza, also testified that Proenza tried calling A.J.V.'s birth mother "like four or five times a day and she would ignore him." She explained that Proenza was trying to reach A.J.V.'s birth mother because "[h]e wanted some papers to-for the baby.... To put him in day care or within-if they were necessary for anything else."

Immediately after the court's comment, Proenza's counsel asked the trial court to instruct the jury that he was not being charged by omission for causing the death of the child but injury to the child. The judge later instructed the jury that,
the way the indictment reads, and that's why I read it to you, he is charged with bodily injury to [A.J.V.], a child 14 years of age or younger, by failing to, one, feed the child, and/or failing to seek medical care for the child. And so he is charged with serious bodily injury that resulted in death as a result of one of those two issues, or a combination of both, okay?

In addition to this argument, the State alleges that Proenza misunderstood two holdings of the Texas Court of Criminal Appeals' opinion in Proenza v. State . See 541 S.W.3d 786, 794, 800 (Tex. Crim. App. 2017). First, we agree with the State and acknowledge that the court of criminal appeals re-confirmed its prior statements that "[q]uestions of 'fundamental error' now are considered in [Marin 's] framework" and set out that "Marin leaves no room for a harm-based doctrine of error-preservation." See id. at 794. We also agree that the court spoke "only on the issue of preservation," not on the issue of harm. See ids="12655922" index="43" url="https://cite.case.law/sw3d/541/786/#p788">id. at 800. To the extent Proenza interprets the opinion otherwise, we are not persuaded by his arguments.
The State further responds that "[w]hen the complaining party does not provide an appellate court with an adequate record, or when that record shows the appellant is partially responsible for the harm, relief should be denied." Among other things, the State notes that the court of criminal appeals "did not hold that objection to alleged improper comments serves no purpose, or that trial counsel no longer has a duty to his client if one of these errors occurs." It claims that defense counsel "should not be permitted to let an error go unaddressed, to allow the harm to fester and grow, and then to take advantage of it as an appellant." The State asks us to "[c]onsider how many opportunities [Proenza] had to stop the trial court's impermissible participation, which then became pointed questioning without objection, which eventually gave way to an uncorrected expression of contrary personal experience related to the point appellant was trying to make through Dr. Grannum...." The State asserts "[t]hat error could have been easily remedied" through an objection, a curative instruction, and a motion for mistrial and that "any harm could have been avoided." See Young v. State , 137 S.W.3d 65, 69 (Tex. Crim. App. 2004) (en banc). Relying on Judge Keasler's concurrence in Tolbert v. State , the State urges that Proenza acquiesced to some of the trial court's actions and should be estopped from complaining about an action that he induced. See 306 S.W.3d 776, 784-85 (Tex. Crim. App. 2010) (Keasler, J., concurring) ("In my view, this case has nothing to do with error preservation or forfeiture; this case should be disposed of on estoppel grounds. The State requested a parties instruction and an instruction on a nondescript lesser-included offense. The trial judge overruled the request and asked Tolbert's attorney if he had any objections to the proposed charge. By stating that he had no objection on the heels of the State's request, Tolbert's attorney approved of the charge sans a lesser-included offense instruction on murder. As a result, we should not be entertaining Tolbert's claim that the trial judge erred in failing to sua sponte include a charge on murder."). The reasoning by the concurrence in Tolbert is analogous to affirmative waiver, which we do not have in this case, as the court of criminal appeals acknowledged. See Proenza , 541 S.W.3d at 801 ("Because the record does not reflect that Proenza plainly, freely, and intelligently waived his right to his trial judge's compliance with Article 38.05, his statutory claim in this matter is not forfeited and may be urged for the first time on appeal.").
While we acknowledge the State's concerns, we note that the Texas Court of Criminal Appeals pre-emptively addressed these matters, providing the following reasoning in support of its conclusion that Proenza was not precluded from urging his complaint for the first time on appeal:
When a litigant perceives a violation of Article 38.05, it is not a foregone conclusion that his silence indicates a relinquishment of his rights thereunder. Silence may just as fairly indicate a litigant's calculation that, if the trial judge is indeed partial to the opposing side in her evidentiary commentary, she will likewise display partiality in ruling upon the Article 38.05 objection itself. An objection under these circumstances would be futile at best, and at worst could reinforce to the jury that the trial judge stands solidly in the corner of the opponent. Article 38.05 violations therefore disrupt the delicate incentive structure that, under Marin 's framework, is so fundamental to the proper functioning of our system.
... [T]he judge is a neutral arbiter between the advocates. When a litigant contends that the trial judge has shirked her duty by openly convey[ing] to the jury [her] opinion of the case, the litigant has necessarily alleged that an alarming perversion of this role has taken place. And because we have said that [j]urors are prone to seize with alacrity upon any conduct or language of the trial judge, we believe such an allegation to be sufficiently weighty as to merit appellate review even in the absence of a partisan objection at trial.... A contrary conclusion has the potential of shaking the public's perception of the fairness of our judicial system and breeding suspicion of the fairness and accuracy of judicial proceedings. The nature of this right is too significant to the judicial system to conclude that it is extinguished by mere inaction.
Of course, we do not hold today that every unscripted judicial comment in fact disrupts the proper functioning of the judicial system or weakens the public's faith in our trial judges.... We do not, then, suggest that every claim brought under Article 38.05 is meritorious or even likely to be so; we speak only on the issue of preservation.
Id. at 799-800 (internal quotations and citations omitted). We need not address these responsive arguments further.

The record reflects that during his testimony, Dr. Farley agreed that A.J.V. "may have survived, especially with just fluids."

Given our disposition of this remand issue, we need not address Proenza's remaining issues and sub-issues, which include challenges to the trial court's denial of Proenza's motion to recuse and its use of "confession" to describe Proenza's recorded interview with law enforcement. See Tex. R. App. P. 47.1.